Filed
D.C. Superior Court
06/15/2020 15:18PM
Clerk of the Court

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

Christina Fay
_____

Case Number: **2020 CA 002781 B**

vs

Humane Society of the United States; Leana Elaine Stormont; Town of Wolfeboro, Carroll County, New Hampshire
_____

Date: June 15, 2020

☑ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| **Name:** *(Please Print)* <br> Paul H. Zukerberg <br> **Firm Name:** <br> Zukerberg & Halperin, PLLC <br> **Telephone No.:**     **Six digit Unified Bar No.:** <br> (202) 232-6400 | **Relationship to Lawsuit** <br> ☑ Attorney for Plaintiff <br> ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury      ☑ 6 Person Jury      ☐ 12 Person Jury
Demand: $ 35,000,000.00                          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____ Judge:_____ Calendar #:_____

Case No.:_____ Judge:_____ Calendar#:_____

---

**NATURE OF SUIT:** *(Check One Box Only)*

### A. CONTRACTS

COLLECTION CASES

☐ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
    Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
    Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
    Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
    Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
    Under $25,000 Consent Denied

### B. PROPERTY TORTS

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

### C. PERSONAL TORTS

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
    Not Malpractice)

☑ 17 Personal Injury- (Not Automobile,
    Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE ☐ IF USED



EXHIBIT
C

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

6-15-2020
_____
Date

CV-496/ June 2015

Filed
D.C. Superior Court
06/16/2020 15:46PM
Clerk of the Court

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | |
|---|---|
| CHRISTINA PATTERSON FAY<br>PO BOX 285<br>MACHIAS, ME 04654<br><br>*Plaintiff,*<br><br>v.<br><br>HUMANE SOCIETY OF THE UNITED STATES<br>*INCLUDING* ITS OFFICERS, DIRECTORS &<br>EMPLOYEES<br>702 H ST. NW, SUITE 400<br>WASHINGTON, D.C. 20001<br><br>&<br><br>LEANA ELAINE STORMONT<br>3422 BROWN STREET NW, APT. #201<br>WASHINGTON, DC 20037<br>&<br><br>TOWN OF WOLFEBORO, CARROLL<br>COUNTY, NEW HAMPSHIRE<br>*INCLUDING* ITS MANAGERS,<br>DEPARTMENTS, OFFICERS, EMPLOYEES,<br>AGENTS, AND ASSIGNS<br>84 SOUTH MAIN STREET<br>P.O. BOX #629<br>WOLFEBORO, NEW HAMPSHIRE 03894<br><br>*Defendants* | CA No.:   2020 CA 002781 B<br><br><br>JURY TRIAL DEMANDED<br><br><br><br>Hon. Jose M. Lopez<br><br>Next Event: Initial Scheduling<br>09/18/2020 |

## FIRST AMENDED COMPLAINT

1

Plaintiff Christina Patterson Fay, by undersigned counsel, demands Judgment against Defendants, jointly and severally, for violation of her constitutional and common laws rights as described below.

## I.   JURISDICTION AND VENUE

1.      Plaintiff, Christina Patterson Fay (Fay), is a United States citizen residing in Machias, Maine. Fay submits to the personal jurisdiction of this Court.

2.      This Court has personal jurisdiction over the Defendant Humane Society of the United States ("HSUS") which is a non-profit 501(c) corporation. HSUS's main office of operations is located at 1255 23rd Street NW, Suite 450 Washington, DC 20037. HSUS has affiliates situated in several states including New Hampshire and Maine. HSUS exercises direction and control over the conduct and actions taken by its employees, affiliates, agents, and assigns.

3.      Defendant Leana Elaine Stormont, ("Stormont") is an attorney licensed to practice in the District of Columbia. Stormont resides at 3422 Brown Street NW, Apt. #201, Washington, DC 20037. Stormont is employed by HSUS's legal department in Washington, D.C. At all times relevant Stormont was acting both in her own individual capacity and on behalf of HSUS her employer.

4.      Defendant Town of Wolfeboro is a municipality in Carroll County, New Hampshire (Wolfeboro).   At all times relevant, Wolfeboro was a contractor and agent of Defendant HSUS operating under a written agreement with HSUS, which by its terms is governed by the laws of the District of Columbia.

5.     This Court has jurisdiction over this action pursuant to D.C. Code §11-921 and 28 U.S.C. §1331, §1343, §1367, 42 U.S.C. §1988, and 18 U.S.C. §1961, §1962, §1964 as applied by the 5th and 14th Amendment Due Process and Equal Protection Clauses of the United States Constitution to each State and the District of Columbia.

6.     Venue is proper because all wrongful acts were planned and directed by HSUS in the District of Columbia pursuant to District of Columbia contract with Wolfeboro unless otherwise noted.

## II.     STATEMENT OF FACTS AS TO ALL COUNTS

7.     Plaintiff Christina Patterson Fay had developed an expertise in the breeding and care of European Great Danes. She engaged in interstate, intrastate and international commerce, that included but was not limited to the purchase of the Danes, transportation of the Danes from various European countries to her home, purchase of goods and services needed for breeding and selling the Danes. Fay also kept for her personal enjoyment and companionship several Danes at any given time. The Danes were expensive and born of a rare European lineage.

8.     Fay had been residing in New York with her former husband. They separated and their divorce was finalized on January 27, 2017. Fay relocated to Bangor, Maine where she resided for approximately six (6) months. She then moved to Wolfeboro, New Hampshire. (Wolfeboro). She paid $1.5 million dollars in cash for a 13,038 square foot home that included 53 acres overlooking a large lake and the White Mountain range. Fay moved fifty (50) European Great Danes and three (3) assistants with her to Wolfeboro.

3

9.      In April of 2017, two (2) of Fay's experienced assistants resigned. One took a better paying job and the other was far along in her pregnancy. The remaining assistant, Julia Smith, continued to work for Fay until June 16, 2017.  In April of 2017, Fay fell and seriously injured her knee. She needed plenty of bed rest and had to use crutches for months. She and Julia Smith had to try to take care of the Danes until other assistants could be hired.  Fay was desperate to hire replacement staff.  Fay hired Marilyn Kelly (Kelly) in late April. Kelly represented herself living on the streets, sleeping on other people's couches, no job, no job opportunities, no money, and no family that would or could help her. Wanting to try to help Kelly get back on her feet, Fay allowed her to use an apartment, free of charge, located in Fay's home. One day, Kelly was trying to load a Dane into Fay's vehicle to drive to a veterinarian appointment and injured her back. Kelly told Fay that she could no longer work due to the back injury. Kelly worked a total of six (6) days. Fay, still feeling sorry for Kelly, allowed her to continue reside in the apartment, free of charge, for the next several weeks. Fay, knowing she needed to reduce her dog population, which had grown to seventy-five (75) adults and nine (9) puppies, asked Kelly if she would locate families to adopt nine (9) of her Danes. Not soon thereafter, Kelly reported that she had found a home for each dog. However, prior to June 16, 2017, Kelly gave two (2) Danes to Monique T. Kramer, DVM (Kramer), who took them to her Fryeburg, Maine rescue facility called 'Long Journey to a New Beginning Animal Rescue' located at 212 Meadow Roade, Stow, Maine 04037. Kramer sold those dogs. Kelly gave the other seven (7) dogs to the Conway Area Humane Society (Conway) located at 233 East Main Street, Wolfeboro, N. H. 03896. It disposed of those dogs. While Fay's Dane 'Ellie' was at Conway, she gave

4

birth to three (3) puppies. Fay, like the rest of her dogs, does not know what happened to the puppies. *After* June 16, 2017 HSUS's agent, Marilyn Kelly, gave Kramer another dog, a harlequin female named 'Fantasia', renamed 'Charlie Girl' by HSUS. Kramer transported Fantasia to a rescue facility, 'The Art of Alternative Healing' located at 285 Main Street Fryeburg, Main; owned and operated by Kramer. Kramer sold Fantasia for an unknown amount to an unknown buyer. Kramer kept the proceeds from that sale. Kelly left Fay's home for good three (3) days before June 16, 2017. Near the time she hired Kelly, Fay hired a teenager to work part-time. The teen worked one-half day and quit.

10.    Defendant Humane Society of the United States, its Officers, Directors, Legal Staff, Employees, Affiliates, Agents, and Assigns (HSUS) is not a government entity but a 501(c)(3) non-profit organization whose goal is to restrict or outlaw the ownership of companion animals. HSUS is ideologically opposed to breeders of pedigree dogs. HSUS does not own or operate companion animal shelters. HSUS has no law enforcement powers. HSUS has a pattern throughout the United States of forming conspiracies for the purpose of raiding citizen's homes, acting as if they have police powers, falsely claiming that animals are being abused, confiscating the owner's dogs and/or other domesticated animals, and of disposing the animals as they see fit. HSUS then uses social and print media, seminars, lectures, pamphlets, and other venues, to rave about their raids, to promote their ideology and to raise money to perpetrate their organization. HSUS advertises that the animals they take are 'adopted' at no cost, a misrepresentation. HSUS charges fees that must be paid prior to the release of an adopted dog. HSUS falsely and fraudulently fails to disclose that they give dogs to their officers, employees, volunteers, and others they deem

to be worthy. HSUS demands reimbursement of their excessive, and undocumented expenses to be paid by local governments and / or by the convicted owner. HSUS refuses to disclose the amount of and / or kind of donations they receive resulting from their professional propaganda media campaigns.

11.     Unbeknownst to Fay, HSUS had been conspiring to raid Fay's home, and profit from the resulting publicity. HSUS has a history of conducting raids under false pretenses, taking unlawful possession of a person's property by acting under the color of law and thereby deny persons their Constitutionally protected right to due process and equal protection of the laws of each state, the District of Columbia and Commonwealths.

12.     HSUS entered into an agreement with the Defendant, The Town of Wolfeboro, giving HSUS the ability to devise, direct, implement, and control Wolfeboro before, during and after June 16, 2017. The agreement, titled "Pre-Deployment Cooperative Agreement," HSUS with Initiating Organization' was signed by HSUS's Senior Director and by Wolfeboro's Town Manager the morning of June 16, 2017, just before the raid of Fay's home began. HSUS contractual agreement with Wolfeboro, included that HSUS was volunteering their services, free of charge to the Town, in exchange for HSUS to devise, coordinate, and carry out a raid for the purpose of taking Fay's Danes. As further consideration, HSUS could use videos, photographs, Facebook, local radio, television, and print media outlets, and all other electronic venues that published stories about the raid and its' continuing aftermath, to raise 'charitable' donations that would contribute to the continuing existence of HSUS.

6

13.     Bobbi Horne Boudman ("Boudman"), an agent of HSUS Wolfeboro, resides at 123 Warren Sands Road, Wolfeboro, NH 03894. Boudman was Fay's distant neighbor. Boudman resides several hundred yards further up the hill from where Fay resided. Boudman published on Facebook false statements, and embellishments, with the intent to defame, destroy Fay's business reputation, and inflict great emotional harm on Fay. Boudman, with HSUS's and Wolfeboro's acquiescence, stirred up public hatred for Fay knowing that Boudman's postings and complaints would help the promotion of their conspiracy to get Fay charged and convicted of inflicting animal cruelty to justify the taking of Fay's dogs. Boudman, even though invited to by Fay, never set foot on Fay's home. Boudman never communicated with Fay. Boudman never observed Fay's treatment of her dogs nor the physical condition of any of Fay's dogs. HSUS did nothing to check on Boudman's and her Facebook friend's veracity.

14.     HSUS, as part of its' conspiracy, sought out and entered into an agreement to lease a warehouse owned by Donald Stoppe ("Stoppe") doing business as Dova Properties LLC located at 1412 Route 175, Holderness, New Hampshire 03245, *several months prior to June 16, 2017.* Stoppe conspired with HSUS that Fay's dogs would be confined in his warehouse, under the direction, and control of HSUS until such time as Fay was arrested, charged, prosecuted, tried, found guilty, sentenced, and the surviving dogs were distributed by HSUS.

15.     Monique T. Krammer, DVM, HSUS's agent, employee, and co-conspirator, under the direction and control of HSUS, was appointed to be the supervising manager of the dogs' care during their confinement. Stoppe and Kramer,

7

while agents and employees of HSUS, knew since at least April of 2017, that HSUS and Wolfboro were going to take Fay's dogs. As evidence of their knowledge, Fay recently discovered material evidence that Stoppe, in April of 2017, applied to the Holderness Town Council for a variance that allow him to widen the narrow side road, the only access to his warehouse. The variance was granted, access road was widened and was ready for HSUS's trucks to deliver Fay's dogs. The Town of Holderness was going to get a windfall of revenue spent by HSUS's employees, staff, volunteers and agents, who, under the direction and control of HSUS, were assigned to Stoppe's warehouse to provide the supervision and care of Fay's dogs. HSUS chose not to hire staff and / or use local volunteers.

16.     HSUS flew its staff to New Hampshire. HSUS paid for their transportation, room, board, medical care and entertainment expenses. HSUS rotated out their volunteers after they had worked one week and rotated in another group of volunteers.

17.     HSUS's volunteers had not been trained to properly care for European Great Danes. Fay's dogs were confined for fourteen (14) months. They were kept in cages. They were rarely exercised. They rarely were allowed outside. Two (2) died of bloat because they were allowed to have access to and drank too much water. The dogs were not allowed to engage in group socialization.

18.     HSUS had devised a policy, that it strictly enforced, that required the renaming of each dog. While under the control and direction of HSUS, Fay's dogs suffered separation anxiety, confusion, disorientation, trauma, and sub-standard medical care. HSUS claims that Fay owes them approximately $1.4 million dollars. Even though HSUS

was not a victim, it claimed to be a volunteer, and was unable to document their expenses, the trial Judge as part of Fay's sentence, ordered her to pay restitution to HSUS in an amount in excess of $1.3 million dollars.

19.     Fay is now aware that at least seven (7) of her Danes, died while in HSUS's possession, direction, and control. The average age of the deceased dogs was eighteen (18) months. The trial Judge allowed Fay to select and keep one (1) her Danes. Fay chose the oldest, "Beta", Fay named her when she was born. Beta has always and continues to respond to her name being used by Fay.  Beta was already approximately four (4) years old when chosen. Beta is now almost seven (7) years old. Beta has remained in Fay's possession. Beta is active, healthy, and a gentle, loving companion. Beta has outlived the average lifespan for European Great Danes.

### III.     THE RAID, JUNE 15-16, 2017

20.     On the night of June 15, 2017, there was a torrential downpour, high winds, thunder, and lightning. Fearing for her Dane's safety and health, Fay and Julia Smith moved the dogs inside. Many of the dogs were kept on the first floor and the rest were put in large dog crates in the basement. The dogs were soaking wet and covered in mud. Fay on crutches, and her only remaining assistant, Julia Smith; were exhausted and unable to clean up the dog's mess.

21.     On the early morning of June 16, 2017, while it was still pouring down rain, and prior to the preparation of the Dane's morning food which included chicken delivered the day before, and before the mess from the night before could be cleaned; approximately eighty (80) individuals descended upon Fay's property. HSUS agent, Kelly, had previously

provided the code to open Fay's privacy gate, to HSUS.  Wolfeboro police, in swat team

clothing, including bullet-proof vests, armed with assault rifles and handguns swarmed

onto Fay's property, guns displayed. A Wolfeboro fire department truck drove onto Fay's

property with its fire fighters and a med-tech team. Wolfeboro health department

employees arrived. HSUS, its' officers, employees, agents, assigns and volunteers illegally

entered upon Fay's property. HSUS drove its' large trucks onto Fay's property. Scores of

other Wolfeboro employees, agents and assigns entered upon Fay's property.

22.     Members of the Wolfeboro SWAT Team and other police officers walked

onto the porch, guns drawn, banged on the door and began yelling demanding entrance.

Julia Smith opened the door. With assault rifles pointed at her face, Smith was warned that

if she did not fully cooperate that she would be arrested. Smith was ordered to bring Fay

to the front door. Fay was greeted with guns pointed at her as officers pushed their way

into her home. Julia Smith's arms were forced behind her back and her wrists were

handcuffed together. She was escorted outside into the pouring rain where she remained

for two (2) hours before being released. Fay's arms were grabbed forced behind her back

and two (2) sets of handcuffs bound her wrists.  Fay was pushed outside and remained in

the pouring rain until she was taken to the Wolfeboro jail.

23.     Wolfeboro officers had a search and seizure warrant in hand. It was flashed

in Fay's face. It was never read aloud by the officers, and Fay was denied the opportunity

to read it. The search and seizure warrant had been illegally obtained. The supporting

probable cause affidavit fraudulently claimed that Fay had been and had continued to

violate a Wolfeboro ordinance that did not allow persons to own and house more than thirty

10

(30) dogs on any given date and time. That ordinance actually states that if a person(s) owns more than thirty (30) dogs they must purchase a 'Group Dog License' and renew it each year. There are no restrictions as to the number of dogs a person can own and have on their property. Fay, soon after her move, purchased a Wolfeboro group dog license and updated it every year. Fay, each year, registered her dogs. Registration included disclosure of all relevant birth and immunization records. Wolfeboro always knew the number of dogs that Fay owned. Wolfeboro, having every dog's detailed records, knew that every dog was very well taken care of by Fay. Fay provided documentation that she spent an average of $10,000.00 collectively for her dog's medical care. The European Great Danes historically are known to be very susceptible to treatable, highly easily contagious non-life-threatening conditions such as 'cherry eye'.

24.     For a search and seizure warrant to be legally obtained, it must also state all mitigating factors to aid the judicial official to determine whether a warrant should be issued. The probable cause affidavit was based upon hearsay and double hearsay with no evidence supporting any of the hearsay's reliability. There were no affidavits from individuals claiming to have witnessed Fay abusing her dogs. There were no photographs, recordings, emails, credible Facebook postings that supported a finding of probable cause to issue a warrant. HSUS contributed to the creation and fraudulent content of the probable cause affidavit.

25.     At about the same time that Fay and Smith were being forcibly removed, HSUS officers, agents, assigns, and volunteers, under the direction and control of HSUS, pushed their way into Fay's home. HSUS employees Monique Kramer, DVM, and Sarah

Proctor, DVM, along with HSUS agents Lindsay Harmick, Tona P. McCarthy, Pope

Memorial SPCA Heather Faria, Pope Memorial SPCA employees, members of the New

Hampshire Disaster Animal Response Team, employees of the HSUS affiliate Pope

Memorial Humane Society, members of the HSUS affiliate Vermont Disaster Animal

Response Team and unknown others, trespassed upon Fay's land and into her home. None

of these people were named in the search warrant as being deputized law enforcement

assistants, none had police powers, all were acting under color of law at the direction and

control of HSUS.

26.     It took approximately fifteen (15) hours to complete the raid. During this

entire time HSUS enforced their inhumane policy that the dogs were to remain in the home,

not have access to water, food, exercise, and / or allowed outside to relieve themselves.

The dogs made an even bigger mess. The dogs were traumatized. Photographs and

videotapes were taken of the mess and distributed to the media with HSUS dialogue. HSUS

claimed that there was dog feces everywhere most of which when later tested proved to be

mud. Photographs were taken of the dog 'excrement'. Photos were photoshopped to

enhance and embellish the scene. An even more vicious public smear campaign was

initiated under the direction and control by HSUS which has not ended. The smear

campaign includes an HSUS directed and controlled seminar that was put on by HSUS

affiliate, New England Animal Control Humane Academy. During the seminar, using

photographs, recordings, media postings, Fay was vilified. Her 'case' was used as a teaching

tool. HSUS has been distributing CD's of the seminar to the public to encourage 'charitable

contributions'.

27.     Upon the direction and control of HSUS the Danes were crammed into undersized cages, put on HSUS trucks, driven to Stoppe's warehouse, and unloaded. Prior to leaving, photos were taken of Danes crammed into HSUS cages. They were later photoshopped to make it appear that Fay had been forcing her dogs to live in them covered in excrement and urine with no source of water.

28.     On June 16, 2017 while Wolfeboro police provided protection, HSUS tore up carpet, damaged hardwood floors, punched holes in walls and ceilings exceeding $135,000.00 to repair. HSUS stole Fay's personal property including but not limited to her diamond wedding rings. Other jewelry and even clothing were taken. HSUS stole Fay's $6,000.00 camera, artwork created by one of Fay's special needs children, and specially crafted personalized Australian dog collars that collectively cost approximately $10,000.00. Fay's furnishings were stolen including four (4) king, four (4) single, and two (2) queen beds. Tempur-Pedic mattresses were stolen Four (4) bedside tables, and two (2) flat-screen TVs valued at $10,000.00 were stolen. A three (3) door side-by-side refigerator, a regular fridge, three (3) washing machines, three (3) dryers and three (3) toilets were stolen. Fay's upstairs master bedroom was damaged, dresser drawers emptied, clothes thrown about, and her four (4) poster bed was stolen. A $15,000.00 eighteen (18) piece place setting of gold rimmed China made especially for Fay's grandfather in 1920 appraised in 1998 by Sotheby's, was stolen. Fay's personal papers including each Dane's FCI and AKC pedigree, purchase receipts, transportation records, and medical records, were stolen. Fay's own medical records were stolen. A list of fourteen (14) Danes, taped to the kitchen refrigerator, that were soon be adopted by families was stolen. Exterior property

13

attachments were damaged beyond repair. The air-conditioned and heated dog houses were stolen. Two (2) storage buildings that were also air-conditioned and heated were stolen. The playground equipment was damaged beyond repair. Dog run fencing, and ramps were destroyed. Fay's metal crates, that HSUS complained about in media postings, were stolen. Wolfeboro police and HSUS failed to lock up the home before they left after they completed their raid. The home was vulnerable to being further looted and damaged.

29.    Just a few days following the raid, the Wolfeboro Chief of Police Dean Rondeaus' wife, Wolfeboro's Health Officer, Schelley Fenske Rondeau who resides at 33 Winnipisaukee Drive, Wolfeboro, NH 03894 an agent of HSUS, posted a sign on Fay's property, stating that the property had been condemned. Fay's home was condemned because of the damage done by the Defendants and each of them. Fay was not given prior notice nor a hearing.

30.    On June 16, 2017 Fay was battered, forcibly and unreasonably detained, charged with several misdemeanor counts of and was convicted of several misdemeanor counts of animal cruelty at the conclusion of a bench trial presided over by a New Hampshire Carroll County District Court Judge. Fay was sentenced. Fay was not entitled to a jury trial in the District Court. Prior to, during and after the bench trial, HSUS promoted local and national pre-trial publicity defaming Fay. New Hampshire allows a convicted and sentenced District court defendant to 'appeal' to the Carroll County Superior Court and granted a jury trial upon motion. Prior to, during and after the jury trial Fay was subjected to a barrage of publicity that referred to her being an animal

14

abuser, a monster, that she should be put in prison; promoted and directed by HSUS and used to attract donations.

31.    HSUS, without Fay's knowledge and consent distributed six (6) Danes to Betti Curran, an agent of HSUS, (Curran) who operates and owns a rescue facility, an affiliate of HSUS, called 'Coastal Maine Great Dane Rescue', located at 9 Lady Slipper Lane, Topsham, Maine 04086. With the knowledge and consent and under the direction of HSUS, Curran sold five (5) of the six (6) dogs, and kept the proceeds from their sale. Curran kept one (1) dog, named "Beefy Boy" for herself. He died on April 7, 2020 of unknown causes. Ironically, HSUS agent Curran using social media, posted slanderous Facebook statements accusing Fay of being an animal abuser even though Fay's dog 'Beta', almost seven (7) years old is alive, active, and healthy.

32.    On September 20, 2017 "Lira" renamed "Bonnie" by HSUS died a horrific death of acute mesenteric volvulus (torsion) caused by unregulated food intake due to the inhumane and negligent care provided by HSUS while confined in Stoppe's warehouse

33.    On November 8, 2017 "Dudley", 15 months old, also died a terrible death caused by gastric dilatation-volvulus. It is a condition that demands emergency veterinary intervention to save a dog's life. He died alone in agony while having been confined the last five (5) months in Stoppe's warehouse. Dudley died without any veterinary intervention in an incredible display of animal cruelty and neglect.

34.    On May 2, 2018 "Bruno" died of bloat / torsion. It is an extremely painful death. The HSUS volunteers had inhumanely and negligently allowed Bruno access to too much water. Danes cannot be allowed to have access to water without close supervision.

15

They will drink too much water, that can cause bloat, that can cause death. During all the years that Fay raised her European Great Danes, not one died of bloat.

35.      Leana Elaine Stormont (Stormont) is employed HSUS staff attorney acting under the direction and control of HSUS. Stormont resides at 3422 Brown Street, Apt. #201, District of Columbia, Washington D.C. Her official title is "Managing Attorney, Animal Crimes Litigation, HSUS". Stormont did not have a license to practice law in New Hampshire. Stormont was present for the entire nine (9) day jury trial. Stormont made sure the jury knew who she worked for and of her intense personal interest in the outcome of the trial. The full extent of Stormont's early participation in the creation and implementation of the HSUS conspiracy is not fully understood at this time. However, Stormont unethically, and fraudulently attempted to obstruct justice by interjecting herself into a jurisdiction where she was not licensed to practice law.

36.      Stormont, not happy about the sentence handed down by the trial Judge, thought it to be too lenient. Stormont falsely claimed that Fay had lied during the sentencing hearing, that Fay should be charged with perjury, re-sentenced and given prison time. Stormont composed and sent a three (3) ring binder along with a cover letter to the trial Judge, a duplicate binder and letter to each of Fay's three (3) defense counsel, and to the Carroll County Prosecutor and the Deputy-Prosecutors who represented the state during the jury trial.  The binder contained false, vicious, embellished, and defaming documents that had been drafted by Fay's ex-spouse, Patrick Fay, who resides in New York, and upon request he sent the documents to Stormont to use as she saw fit. Stormont adopted and used Patrick Fay's written statements, not knowing if they were true or not, to vilify Fay and to

16

try to convince the trial judge to dole out harsher punishment. Stormont's unsolicited and unwanted intervention was made known when the trial judge refused to read any of the contents of Stormont's three (3) ring binder, and ordered it to be placed in a container that was to be sealed and kept by the Court so as to not allow access to the public. When Stormont learned that the trial Judge would not reopen Fay's sentencing hearing, Stormont sent a second letter, a scathing rebuke of the trial Judge's ability to dispense justice, Stormont's version of justice. Stormont, acting under the direction and control of HSUS demonstrated a vendetta against Fay and the trial Judge. Stormont, under the direction and control of HSUS defied the ethical standards long established and applied to all attorneys, by illegally and unethically making a concerted and determined effort to interfere with and obstruct the trial court Judge's decision making powers and administration of her Court. At the same time, Stormont, by distributing her binder to defense counsel and the prosecutors, the contents of which could be accessed by defense counsel and prosecutor staff, shared with their family members and friends, distributed a poison media pill that could surface and cause Fay future emotional harm and financial loss.

37.     Fay was denied a pre-deprivation hearing before a New Hampshire judicial officer. HSUS, Wolfeboro and Stoppe conspired and carried out their conspiracy to deprive Fay of her legally acquired property without giving her the opportunity to present evidence as to why her property should not be left in her possession for her peaceful enjoyment. The United States Constitution Fourth and Fifth Amendments are applied to each State, to the District of Columbia and to its Commonwealths by the Fourteenth Amendment Due Process and Equal Protection Clauses. By not conducting a pre-deprivation hearing, the

17

Defendants, jointly and severally violated Fay's Constitutional right to life, liberty, property, and the pursuit of happiness. If had been granted a pre-deprivation hearing, Fay would have had the right to avail herself of all procedural and evidentiary safeguards allowing her to testify, present material evidence, present others to testify on her behalf and to make oral argument. Fay would have proven that she had spent collectively millions of dollars to acquire and care for her European Great Danes. Fay would prove that she had spent hundreds of thousands of dollars for medical care for her dogs. She could prove that she devised a special diet that included at great daily cost, the delivery of fresh chicken for the purpose of improving each dog's health and hopefully their longevity. She could prove that she kept every dog well groomed. She could prove that she, at great cost, provided a safe, and healthy outdoor environment for her dogs. Fay would prove that she spent thousands of dollars to fence in six (6) acres of her 54 acres, just so that her dogs had plenty of room to socialize, play and exercise. Fay would prove that she purchased a group dog license and updated it every year. Fay would prove that she followed all of Wolfeboro's registration and licensing ordinances, every year. Fay would prove that she had a world-wide excellent reputation as being an expert breeder of European Great Danes. Fay would prove that she did not need the money from the sale of her dogs. Fay would prove that her dogs were gentle giants, and her loving companions. Dog abusers do not purchase dog collars at no less than a $1000.00 apiece, that were specially crafted in Australia that displayed each dog's name and that Fay gave to each person who purchased and / or adopted one of her dogs. HSUS would not allow Fay's dogs to wear their specially made collars. Fay could have proven that she was in the process of reducing her dog population.

18

Fay could have proven that she had hired additional staff. Fay could have proven that she was going have a sound barrier built around the dog's recreation area. Fay would have testified that she invited Boudman to meet at her home so that she could explain the steps that were being taken to alleviate Boudman's complaints. Boudman refused the invitation and never invited Fay to her home. The pre-deprivation hearing officer could have ordered mediation. Fay would have been entitled to appeal a hearing officer's ruling should it not have been in her favor. Pending that appeal, the status quo is enforced, Fay would continue to own and have possession of her dogs.

## COUNT I

### (42 U.S.C. 1983, *et. seq.*)

38.     Plaintiff restates and incorporates fully of the allegations of paragraphs 1 – 37 above as if fully stated herein.

39.     Fay brings this action pursuant to 42 U.S.C. §1983 to redress the deprivation under color of state law, of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution as applied to each State and to the District of Columbia by the Fifth and Fourteenth Amendments Due Process and Equal Protection of the Law clauses.

40.     HSUS, Stormont, and Wolfeboro acting jointly and severally under the color of law, created and implemented a conspiracy that resulted in the unlawful deprivation of Fay's lawfully acquired and owned property, damage to Fay's property, criminal acts, defamation, and the intentional and negligent infliction of emotional harm causing in excess of thirty-five million dollars ($35,000,000.00) in damages.

41.     Fay brings this action pursuant to 42 U.S. Code 1988 (a), (b), (c). Proceedings in Vindication of Civil Rights as applied to each State, to the District of Columbia and to the Commonwealths as the Defendants, jointly and severally violated Fay's United States Constitutional Civil Rights To Life, Liberty, Property and the Pursuit of Happiness, against Unlawful Intrusions, against Unlawful Detainment, against Unnecessary and Unreasonable

42.     Fay brings this action pursuant to 18 U.S. Code §1962 (c) & (d); Conspiracy to commit trespass, theft, conversion, destruction of property and defamation of Fay's character, disrupting interstate and foreign commerce for individual and institutional financial gain as applied to each State, to the District of Columbia and to the Commonwealths resulting in Fay incurring current substantial and future damages.

## COUNT II

## (RICO CONSPIRACY)

43.     Plaintiff restates and incorporates fully of the allegations of paragraphs 1 – 42 above as if fully stated herein.

44.     Fay brings this action pursuant to 18 U.S. Code 1961, Racketeering Section 1344 Institutional Fraud, Section 1503 Obstruction of Justice, Section 1957, (RICO) Trespass, Theft of property, Conversion of property, Destruction of Property for institutional and individual financial gain against the Defendants jointly and severally in that they engaged and have continued to engage in a pattern of conduct throughout the United States of America in violation of RICO causing harm to Fay whereby she should

20

be awarded treble damages, costs of this litigation, and attorney fees that collectively will equal in excess of $35,000,000.00.

55.     For the past several years, throughout the United States, HSUS has consistently engaged in the use of electronic, radio, television, and print media to fraudulently obtain charitable donations of money and goods from the public. HSUS has fraudulently advertised to give the public the impression that it possess police powers that allows them, under the color of law, to enter upon a person's property uninvited, to inspect and then take possession of their dogs and/or other domesticated animals. HSUS has for years, has used intimidation tactics throughout the United States, using the airwaves and print media, to try to impose their ideology that there needs to be legislature passed that outlaws the breeding, selling and possession of pedigree dogs and other domesticated animals. HSUS has fraudulently characterized the breeding, sale, ownership to train dogs to assist the blind, to provide protection, to assist our armed forces and police, to provide comfort for hospitalized children, and/or to provide companionship for families and individuals, as acts of animal abuse. The Defendants, jointly and severally, committed systematic violations of the Racketeer Influenced and Corrupt Organizations Act, by engaging in a pattern of racketeering activity that includes conspiracy, obstruction of justice, intimidation, perjury, mail fraud, use of the public airwaves and print media to spread false and embellished information, publish malicious slander and defamation; to justify the illegal taking of Fay's dogs, the theft of her personal and household effects, for the damage caused to her home, for destroying Fay's reputation as an expert breeder of European Great Danes, for their flagrant disregard of Fay's basic and fundamental rights

as guaranteed by the United States Constitution, and for their heinous infliction of emotional harm, Fay demands treble damages, payment of costs and payment of her attorney fees.

## Count III

### (Common Law Claims)

46.    Plaintiff restates and incorporates fully of the allegations of paragraphs 1 – 45 above as if fully stated herein.

47.    Fay brings this action against the Defendants, jointly and severally, theft and conversion of Fay's property.

48.    Fay brings this action against the Defendants, jointly and severally, for defamation and slander.

49.    Fay brings this action against the Defendants, jointly and severally, for trespass.

50.    Fay bring this action against the Defendants, jointly and severally, for the damage caused and destruction caused to her property.

51.    Fay brings this action against the Defendants, jointly and severally, for the intentional and continuing infliction of emotional harm.

### AD DAMNUM

52.    Plaintiff demands damages against all Defendants jointly and severally as follows:

53.     For the Defendants jointly and severally illegal taking and conversion of Fay's eighty-four (84) European Great Danes, Fay demands judgment in the approximate amount of $999,000.000.

54.     For the loss of stud and breeding income caused by the Defendants jointly and severally, Fay demands judgment in the approximate amount of $8,000,000.00.

55.     Fay paid $1.5 million dollars in cash for her Wolfeboro home and land. The Defendants jointly and severally are liable for the reduction in the home's fair market value, and Fay demands judgment in the amount of $1,000,000.00.

56.     For Fay to be able to make her home sellable, she had to repair all damage caused by those under the direction and control of each Defendant.  Fay demands judgment from the Defendants, jointly and severally; in the amount of $750,000.00.

57.     Fay demands judgment from the Defendants, jointly and severally in the amount of $142,000.00 for the bond she had to pay to keep her dogs from being euthanized.

58.     Fay demands judgment from the Defendants, jointly and severally in the amount of $350,000,00 for the theft and destruction of her personal belongings and household furnishings.

59.     Fay demands judgment from the Defendants, jointly and severally for her defense and appellant attorney fees in the approximate amounts as follows;

> Kent Barker: $240,515.80
> Jim Cowles    $42,000.00
> Jeremy Cohen $30,000.00
> Theodore Lothstein $80,000.00
> Mock Trial: $11,000.00

60.     Fay demands judgment in the total approximate amount of $11,644,000.00 as compensatory damages from the Defendants, jointly and severally liable.

61.     Fay demands judgment from the Defendants, jointly and severally in the amount of $15,000,000.00 for the permanent loss of the love and affection of her dogs, and for the intentional, negligent, and permanent infliction of emotional harm.

61.     Fay demands judgment from the Defendants, jointly and severally, in the amount of $10,000,000.00 for violations of these Federal Statutes.

62.     Fay demands judgment from the Defendants, jointly and severally, in an amount that fairly and justly compensates her for all violations committed by the Defendants, jointly and severally, of the laws enacted by the District of Columbia, Washington, D.C.

63.     Plaintiff demands a trial by jury on all counts and issues.

WHEREFORE, Christina Patterson Fay, by her counsel, prays that the jury renders a judgment in favor of Christina Patterson Fay and against the Defendants, jointly and severally liable, that includes treble damages, costs, and attorney fees, that totals an amount in excess of thirty-five million dollars ($35,000,000.00), for trial by jury and for all other relief just in the premises.

Respectfully Submitted,

/S/ PAUL ZUKERBERG

Paul Zukerberg, Esq., D.C. Bar #388152
ZUKERBERG & HALPERIN, PLLC
1790 Lanier Place NW
Washington, DC 20009
Tel: (202) 232-6400
paul@zukerberg.com

24